Plaintiff Exhibit 2

# Remarks by R. K. Arnold
# President of Merscorp. Inc. before
# Senate Committee November 16, 2010

**Remarks of R.K. Arnold**
**President and CEO of MERSCORP, Inc.**
**Before the Senate Committee on Banking, Housing and Urban Affairs**
**November 16, 2010**

Chairman Dodd, Ranking Member Shelby and members of the Committee, my name is

R.K. Arnold. I am President and CEO of MERSCORP, Inc. Thank you for this opportunity to

appear today.

MERS is a member-based organization made up of about 3,000 mortgage lenders. It

maintains a nationwide database that tracks changes in servicing rights and ownership interests

in mortgage loans. Today MERS is keeping track of 31 million active loans.

The MERS database is important to the mortgage industry because it is the only

centralized registry in the industry that uniquely identifies each mortgage loan.

The MERS database is important to individual borrowers because it provides a free and

accessible resource where borrowers can locate their servicers, and in many cases, learn who

their note-owner is as they change over time.

The MERS database is important to communities because housing code enforcement

officers use it to identify who is responsible for maintaining vacant properties.

The MERS database aids law enforcement in the detection of mortgage fraud by

tracking liens taken out utilizing the same borrower name, social security number, or property.

MERS also performs another key function: It serves as the mortgagee of record, or the

holder of mortgage liens, on behalf of its members as a common agent. MERS is designated as

the mortgagee in the mortgage document, and this designation is approved by the borrower at

loan closing and then recorded in the appropriate local land records.  Serving as the mortgagee

enables MERS to receive and maintain updated information as loan servicers and noteholders

change over time because we are the central clearinghouse for receipt of mail as mortgagee.

One thing that is always clear in a mortgage document is that if the borrower defaults on his

obligation, the lender can foreclose.  If MERS holds the mortgage lien, foreclosures can occur in

two ways: Either the MERS mortgage interest is reassigned in the land records to the lender

holding the note and the lender initiates the action on its own, or MERS initiates the action as

the mortgagee of record in the land records.

To do this, MERS relies on specially designated employees of its members, called

certifying officers, to handle the foreclosure. To be a MERS certifying officer, one must be an

officer of the member institution who is familiar with the functions to be performed, and who

has passed an examination administered by MERS. Generally, these are the same individuals

who would handle the foreclosure if the lender was involved without MERS.  The loan file

remains with the servicer as it did before MERS.  MERS is not a repository for mortgage

documents or promissory notes.

MERS derives its revenues entirely from fees charged to its members—it makes no

money from foreclosures.  And MERS does not decide when to foreclose.  Foreclosure must be

authorized by the note-owner (or noteholder), and it must be done in accordance with our

strict rules and procedures, which we regularly enforce and refine.

For example, it is a key MERS rule that the note must be presented in a foreclosure,

which some states do not require. And we prohibited the use of lost note affidavits in

foreclosures done by MERS once we learned they were being used as an excuse to not produce the note.

Earlier this year, when we became aware of acceleration in foreclosure document processing, we grew concerned that some certifying officers might have been pressured to perform their responsibilities in a manner inconsistent with our rules.  When we did not get the assurances we thought were appropriate to keep this from happening, we suspended our relationships with those companies.

When we discovered that some so-called "robo-signers" were MERS certifying officers, we suspended their authority until they could be retrained and retested.  We are asking our members to provide us with specific plans outlining how they intend to prevent such actions in the future.

Mr. Chairman, all of us at MERS keenly understand that while owning your own home is a dream, losing that home is a nightmare.  As professionals who have dedicated ourselves to helping people realize their dream, we are deeply dismayed by the current foreclosure crisis.  We take our role as a mortgagee very seriously and we see our database as a key to moving toward better access to information and transparency for consumers.

I am hopeful that as people understand more about MERS and the role we play, they will see that MERS adds great value to our nation's system of housing finance in ways that benefit not just financial institutions, the broader economy and the government, but—most of all—real people.

Thank you for holding these hearings and inviting MERS to participate.

### Testimony of R.K. Arnold
### President and CEO of MERSCORP, Inc.
### Before the Senate Committee on Banking, Housing and Urban Affairs
### November 16, 2010

Chairman Dodd, Ranking Member Shelby and members of the Committee, my name is R.K. Arnold. I am President and CEO of MERSCORP, Inc. and its subsidiary, Mortgage Electronic Registration Systems, Inc. I appreciate the opportunity to appear before the Committee today to explain what MERS is and isn't, its critical role in our nation's housing finance system, and how MERS has been affected by the current foreclosure crisis.

I have written testimony and an oral statement that has already been delivered to the committee that I would request be made part of the record.

**BACKGROUND**

MERS is owned by the mortgage industry[1] and operated as a membership organization. Almost all mortgage lenders (about 3,000) are members of MERS, though not all members register all the loans they originate on the MERS® System.[2] MERS derives its revenue solely from its members.[3] MERS charges no fees and makes no money from mortgages, from the

---

[1] MERSCORP, Inc. is structured as a privately held stock company. Its principal owners are the Mortgage Bankers Association, Fannie Mae, Freddie Mac, Bank of America, Chase, HSBC, CitiMortgage, GMAC, American Land Title Association, and Wells Fargo. MERS is headquartered in Reston VA.

[2] Members tend to register only loans they plan to sell. Wells Fargo and JP Morgan Chase are the principal members in this regard. They service most of the loans they originate themselves, so registering their retail business on the MERS® System is of less practical value to them. However, when these institutions purchase loans from others, known as their correspondent business, they do require that those loans be registered on the MERS® System.

[3] MERS makes its money through an annual membership fee (ranging from $264 to $7,500) based on organizational size, and through loan registration and servicing transfer fees. MERS charges a one-time $6.95 fee to register a loan and have Mortgage Electronic Registration Systems, Inc. serve as the common agent (mortgagee) in the land records. For loans where Mortgage

Testimony of Mr. R.K. Arnold, 11/16/2010
Senate Banking, Housing and Urban Affairs Committee

securitization or transfer of mortgages, or from foreclosures done in its name.

MERS serves two important functions.  First, it maintains a database or registry of

mortgage loans, keeping track of changes in servicing rights and beneficial ownership interests

over the life of the loan.  Second, it can be designated by its members to serve as the

mortgagee, or the holder of the mortgage lien, in the public land records.  This designation is

what enables MERS to maintain its accurate database.


## MERS AND YOUR MORTGAGE

The mortgage loan process can be confusing and complex to consumers.  There is a lot

of paperwork generated and many documents to be signed.  However, two pieces of paper

stand out from the rest as the most important pieces needed so that the consumer can get a

mortgage loan. They are: (1) the promissory note, which is a promise by the borrower to repay

the loan amount to the lender or noteholder; and (2) the mortgage (also referred to as the

"deed of trust" in some states), which establishes a lien against the property as collateral for

the loan and allows the lender (or noteholder) to foreclose on the property if the borrower

does not repay the loan according to the terms of the promissory note.  The person who

borrows the money is called the "mortgagor" and the holder of the mortgage is called the

"mortgagee."  Once the borrower signs both pieces of paper, the borrower receives the money

to buy the house.  To obtain a mortgage loan, the borrower must agree that the mortgagee has

the right to foreclose in the event of a default.

---

Electronic Registration Systems, Inc. will not act as the mortgagee, there is only a small one-time registration fee ($0.97).  This is known as an iRegistration.  Transactional fees (ranging from $1.00 to $7.95) are charged to update the database when servicing rights on the loan are sold from one member to another.

Another important party in the life of a mortgage loan is the loan servicer.  The servicer is a company named (by the note-owner) to be the interface between the note-owner and the borrower to collect payments and remit them to the note-owner.  It may become the noteholder for purposes of enforcing the terms of the note on behalf of the note-owner.[4]

MERS acts as the designated "common agent" for the MERS member institutions in the land records, which means that MERS holds the mortgage lien on behalf of its members and acts on their behalf as mortgagee.  To accomplish this, at the time of the closing, the borrower and lender appoint MERS to be the mortgagee.  The designation of MERS is prominently displayed on the mortgage document and is affirmatively approved by the borrower at closing.[5] After the borrower executes the mortgage document, it is recorded in the public land records with Mortgage Electronic Registration Systems, Inc. noted in the index prepared by the recorder (or clerk) as the mortgagee.  Mortgage loan information is then registered on the MERS database.

These two key pieces of paper in a mortgage transaction follow very different paths after they are signed.  The mortgage (or deed of trust) is recorded in the county land records where an imaged copy is stored.[6]  The original mortgage document, with recording data added by the county recorder, is returned to the servicer and goes into the servicer's master loan file. The note is sent to a custodian (usually a regulated depository institution) and is typically

---

[4] The originating lender may be the servicer in some cases.

[5] A copy of a sample mortgage document can be found in Attachment One.  A short summary of MERS prepared by the Mortgage Bankers Association can be found in Attachment Two.

[6] This action tells the world that there is a lien against the property.  This is done to protect the lender's interest.  The recording of the mortgage puts future purchasers on notice of any outstanding claims against the property.

bought and sold (and thus trades hands) in the normal course of financial activity.[7]  The servicer undertakes the obligations to service the loan, but servicing rights also may move from one servicing business to another because servicing rights are contract rights, which are bought and sold independent of any sale of the promissory note.  MERS does not receive or maintain either the mortgage or the promissory note.

Every time a note or servicer changes hands, a notation of that change is made (electronically) on the MERS® System by the members involved in the sale.  In this way, changes in servicing rights and beneficial ownership interest in the promissory note are tracked over the life of the loan.[8]

A fundamental legal principle is that the mortgage follows the note, which means that as the note changes hands, the mortgage remains connected to it legally even though it is not physically attached.  In other words, the promissory note is enforceable against the property because of the mortgage, but the mortgage instrument itself is not independently enforceable as a debt. This principle is not changed when MERS is the mortgagee because of the agency relationship between MERS and the lender.  An agency relationship arises where one party is specifically authorized to act on behalf of another in dealings with third persons, and the legal definition of a "nominee" is a "party who holds bare legal title for the benefit of others."  Here, the language of the mortgage appoints MERS as nominee, or agent, for the lender and its successors and assigns for the purposes set forth therein.  The mortgage also grants MERS

---

[7] The promissory note is not (and never has been) recorded or stored with the county land records office.  The note is a negotiable instrument that can be bought and sold by endorsement and delivery from the seller to the note purchaser. This activity is governed in all fifty states by the Uniform Commercial Code (UCC) Article 3.

[8] The MERS® System is the database; MERSCORP, Inc is the operating company that owns the database; and Mortgage Electronic Registration Systems, Inc ("MERS") a subsidiary of MERSCORP, Inc., which serves as mortgagee in the land records for loans registered on the MERS® System.  For discussion purposes, "MERS" may be used in this testimony to refer to all three entities unless specifically stated otherwise.

broad rights, again as nominee for the lender and the lender's successors and assigns, "to

exercise any or all" of the interests granted by the borrower under the mortgage, "including but

not limited to, the right to foreclose and sell the property; and to take any action required of

the lender." Thus, the language of the recorded mortgage authorizes MERS to act on behalf of

the lender in serving as the legal titleholder under the mortgage and exercising any of the rights

granted to the lender there under.

MERS members affirm this agency relationship with MERS in their membership

agreements, which provide that MERS "shall serve as mortgagee of record" with respect to

each mortgage loan that the MERS member registers on the MERS System and provide that

"MERS shall at all times comply with the instructions of the holder of mortgage loan promissory

notes."


**THE MECHANICS OF MERS**

MERS tracks mortgage loans through an 18-digit identification number called the

Mortgage Identification Number (MIN).  With one notable exception, the MIN is to a specific

home loan what the VIN (Vehicle Identification Number) is to an individual automobile.  Like

the VIN, the MIN can be assigned at the earliest stage of the product's creation and stays with it

for its entire life.  However, unlike cars which all get a VIN, not all loans get MINs and are

registered on the MERS® System.  This is because some loan originators do not use MERS when

they do not intend to sell the servicing rights.  About half of all loans active in the United States

are registered on the MERS® System.

As the mortgagee of record, MERS receives all notices including legal pleadings on actions pertaining to the property such as foreclosure notices and complaints, tax sales and eminent domain actions, among the many other types of mail. MERS forwards those documents electronically to the relevant servicer who will then take the appropriate action to respond on behalf of the note-owner and MERS.

MERS plays an important role for borrowers as the permanent link between borrowers and their servicers. If servicers change or if they declare bankruptcy, the borrower always has a knowledgeable point of contact in MERS. A toll free number, the unique Mortgage Identification Number (MIN) and mailing address are prominently included on the first page of the mortgage document. MERS also maintains a website, which serves as another resource for borrowers. MERS is also a means by which the borrower can easily identify the note-owner.[9]

MERS is not part of the decision-making process as to which mortgage loans the lenders make to borrowers, nor is MERS part of how mortgage loans get securitized. It is the note-owner who decides whether a note should be sold, or transferred to a trust, or ultimately securitized with a pool of other loans.[10] Loans were securitized long before MERS became operational, and in fact, there are loans in securities today that do not name Mortgage Electronic Registration Systems, Inc. as the mortgagee. What MERS does is eliminate the expense of repeated assignments, resulting in lower cost for lenders when they sell the loans

---

[9] The design of the MERS® System always anticipated and required that borrowers would be able to access the system to determine the servicer of their loans. Providing such information to MERS is a requirement of membership and loan registration. When Congress acted last year to require that borrowers be told when their note is sold and the identity of the new note-owner, MERS established, within a matter of weeks, a new service called Investor ID. Of the 3,000 members of MERS, 97% agreed to disclose the identity of the note-owner through the MERS® System. Fannie Mae opted to be disclosed. Freddie Mac chose not to be disclosed.

[10] The issue of whether transfers of residential mortgage loans made in connection with securitizations are sufficient to transfer title and foreclosure rights is the subject of a "View Point" article entitled "Title Transfer Law 101" by Karen Gelernt that appeared in the October 19, 2010 edition of the *American Banker*. A copy can be found in Attachment Three.

(represented by the promissory note) to investors.  When the note is sold, MERS continues to

act as the mortgagee for the new noteholder because the mortgage interest follows the note

when it changes hands.


## OTHER FACTS ABOUT MERS

The number of loans registered on the MERS® System is substantial.  Since its

establishment in 1997, about 66 million loans have been registered and tracked on the MERS®

System.  About half of those loans (about 31 million) are active mortgage loans.

Measured by direct employment, MERS is a relatively small organization.  About 50

people work for MERSCORP, Inc. in our Reston, Va. office.  Hewlett-Packard is the MERS

technology partner and runs the database with an additional 150 people.

In significant ways, MERS is analogous to the Depository Trust and Clearing Corporation

(DTCC) that electronically records the assignment of stock and bond certificates, thus

eliminating the need to create a new certificate each time a security is bought or sold.  The

benefit of MERS is similar to that of the DTCC: It reduces the errors associated with paper

processes and increases system efficiency.[11]  Also like the DTCC, MERS is adjacent to the

systems that create the data it tracks; it is integrated with, but independent of, its member

organizations.  The two primary differences between the organizations are that the DTCC holds

title to the financial instrument and that it clears trades between its participants (including the

exchange of funds between the counter-parties).

---

[11] A 1993, 36-page white paper entitled "Whole Loan Book Entry Concept for the Mortgage Finance Industry" addresses the
concepts underlying MERS and the problems it was designed to address. It is available upon request.

Testimony of Mr. R.K. Arnold, 11/16/2010
Senate Banking, Housing and Urban Affairs Committee

## MERS CERTIFYING OFFICERS

Mortgage Electronic Registration Systems, Inc. takes the majority of its actions as the mortgagee through the use of officers commonly referred to as "certifying officers." From inception, the concept of certifying officers has always been fundamental to the operations of MERS. In the white paper calling for the creation of MERS (referenced in footnote 11), it was recognized that members would need to have a form of authority to act on behalf of MERS when MERS is the mortgagee on their behalf. That authority took the form of electing persons (designated by the member) as officers with limited authority to take certain actions. The offices to which each of these individuals are officially appointed are vice president and assistant secretary. The authority granted to these officers is limited to: (1) executing lien releases, (2) executing mortgage assignments, (3) initiating foreclosures, (4) executing proofs of claims and other bankruptcy related documents (e.g., motions for relief of the automatic stay), (5) executing modification and subordination agreements needed for refinancing activities, (6) endorsing over mortgage payment checks made payable to MERS (in error) by borrowers, and (7) taking such other actions and executing documents necessary to fulfill the member's servicing duties.

It is important to note that the certifying officers are the same officers whom the lenders and servicers use to carry out these functions even when MERS is not the mortgagee. MERS has specific controls over who can be identified by its members as a certifying officer. To be a MERS certifying officer, one must be a company officer of the member institution, have basic knowledge of MERS, and pass a certifying examination administered by MERS.

Under the corporate law in Delaware (where MERS is incorporated), there is no requirement that an officer of a corporation also be an employee of that corporation. A corporation is allowed to appoint individuals to be officers without having to employ those individuals or even pay them. This concept is not limited to MERS. Corporations cannot operate without officers; they can and often do operate without employees. It is not uncommon for large organizations to have all its employees employed by an operating company and for those employees to be elected as officers of affiliated companies that are created for other purposes (all corporations are required by law to have officers to act for it). Even for loans where MERS is not the mortgagee, employees of the servicer are generally delegated the power to take actions (e.g., initiate foreclosures) and execute documents (e.g., lien releases and assignments) on behalf of the owner of the loan (and the servicer, in turn, may further delegate such authority to a third-party vendor).

## MERS AND FORECLOSURE

When Mortgage Electronic Registration Systems, Inc. is the mortgagee of record, and the borrower is in default on the mortgage, and the note-owner decides to foreclose, foreclosure can be undertaken in one of two ways: Either in the name of MERS, or in the name of the noteholder (which is usually the servicer).

If the noteholder chooses to foreclose in its own name, under the MERS rules, it must be named as mortgagee in the land records. MERS, through the MERS member's designated certifying officer, will execute an assignment to the foreclosing company and the assignment will be recorded in the land records. At this point, MERS no longer holds any legal interest in

the mortgage, and it plays no further role in the foreclosure process.  Most loans are assigned

out of MERS in this way and not foreclosed in the name of MERS.

 If the note-owner chooses to have Mortgage Electronic Registration Systems, Inc.

foreclose, then the note-owner endorses the note in blank (if it has not already done so),

making it bearer paper, and grants possession of the note to a MERS certifying officer.  This

makes MERS the noteholder.  Since MERS is already the mortgagee in the land records, MERS is

now able to legally begin the foreclosure process on behalf of the note-owner.  The foreclosure

is managed entirely by the member institution's MERS certifying officer.  This person typically

works in the default department within the MERS member institution so they are familiar with

the various state foreclosure requirements.  The member manages the relationship with the

law firm that is handling the foreclosure.  The member retains the law firm on behalf of MERS

and the member provides the necessary documents and information to the law firm.  The

member obtains these documents and information from the servicing files and system, which

are maintained by the member.

 As noted earlier, the MERS certifying officers are the same employee officers who

handle foreclosure functions for the MERS member institutions.  Whether a foreclosure is

initiated in the name of MERS and handled by the certifying officers, or by the lender in its own

name, the same people would be doing the work.  Likewise, the loan file remains with the

servicer as it did before MERS existed.  MERS is not a repository for mortgage documents or

promissory notes.

 It is important to note that Mortgage Electronic Registration Systems, Inc. only initiates

foreclosure when it has been instructed to do so by the servicer (acting on behalf of the note-

owner) or directly by the note-owner. MERS has strict rules and procedures governing

foreclosure, most notably a requirement that the certifying officer be in possession of the

mortgage note when foreclosing in the name of MERS. In addition, pursuant to a 2006 MERS

membership rule, no foreclosures in the name of MERS are allowed in the State of Florida.

In the event a MERS member contracts out foreclosure operations to a vendor or a law firm, a

separate contract is entered into by MERS, the MERS member and the contracted firm for the

purpose of establishing our understanding of the obligations of the parties and for the purposes

of designating certifying officers. The specific, authorized functions of MERS certifying officers

are enumerated in a corporate resolution by which MERS makes the appointment.

Because there is a choice whether a foreclosure is done in the name of the servicer,

note-owner or MERS, one might wonder if there is an advantage in choosing one way or the

other. The advantage to institutions by foreclosing in the name of MERS is that they do not

need to record an assignment from MERS to themselves, saving them time and money. The

advantage that some lenders see in not foreclosing in the name of MERS is that the MERS rules

are strict and require that the note be produced. If the lender does not want to do this, the

MERS member cannot commence a foreclosure action in the name of MERS, but must assign

the mortgage out of MERS. This is a major reason why most loans are not foreclosed in the

name of MERS.

In 2005, when it became apparent to us that foreclosures undertaken in Florida were

relying excessively on lost note affidavits, MERS adopted a rule forbidding the use of lost note

affidavits when foreclosures were done in the name of MERS in Florida. That rule was

extended nationally in 2006 and is still in effect today. MERS believes that borrowers are

entitled to know that the company foreclosing has all of the necessary paperwork and rights to

do so. Showing up with the original note provides the borrower and the court with proof that

the foreclosing company is the proper party to foreclose.


**COMMON QUESTIONS ABOUT MERS STRUCTURE AND ROLE IN MORTGAGE MARKETS**

When servicing rights or promissory notes are sold for loans where MERS is not the

mortgagee, the usual practice is for the seller to execute and record an instrument assigning

the mortgage lien to the purchaser (commonly referred to as an "assignment"). Assignments

are not required by law to be recorded in the land records. The primary reason assignments

are recorded (in cases where MERS is not the mortgagee), stems from the appointment of

servicers to administer the loan on behalf of the mortgage loan owner. In which case, the

servicer will be assigned the mortgage lien (thus becoming the mortgagee) in order to receive

the service of process related to that mortgage loan. When Mortgage Electronic Registration

Systems, Inc. is the mortgagee (i.e., holds the legal title to the mortgage lien), there is no need

for an assignment between its members because MERS is the common agent for them. It is not

the case that the assignments are now being done electronically through the MERS® System

instead of being recorded in the land records. The need for an assignment is eliminated

because title to the mortgage lien has been grounded in MERS. Moreover, transfers of

mortgage notes and servicing rights are not recordable transactions (and have never been

reflected in the land records) because they are not a conveyance of an interest in real property

that is entitled to be recorded; only the transfer of the lien is a conveyance. A promissory note

is sold by endorsing the note, and delivering it to the purchasers. Servicing rights are non-

recordable contracts rights.  Mortgage Electronic Registration Systems, Inc. remains the

mortgagee regardless of the number of these non-recordable transfers that may occur during

the life of the loan.  Upon such sales, the seller and purchaser update the MERS® System of the

transfer with an "electronic handshake."  If the purchaser does not confirm the transaction, it is

flagged by the MERS® System for follow-up.  MERS also audits its members for the accuracy of

the information they provide to the MERS® System.

The only reason servicers needed to appear in the county land records before MERS was

so they could receive legal notices pertaining to the property.  That role is now played by MERS

as their common agent.  MERS runs a massive mailroom and help desk operation to handle

millions of legal notices for its members, which makes it far more efficient and certain that mail

will go to the correct place.  Today, if a servicer "boxes up" in the middle of the night and

disappears, the homeowner can have confidence that legal notices will be delivered to the

correct successor company without delay.

The chain of title starts and stops with Mortgage Electronic Registration Systems, Inc. as

the mortgagee.  MERS, as the agent for the note-owner, can hold legal title for the note-owner

in the land records.[12]  The basic concept of a recording statute is that a person or company

claiming an interest in land protects its interest by recording that interest at the county

recorder of deeds office.  The recorded document provides constructive notice to the world of

the claim.  In many states, there is no requirement that a conveyance of real estate must be

recorded in the land records.  The concept of nominees appearing in the land records on behalf

_____

[12] The essential elements of the legal principles underlying MERS can be found in "MERS Under Attack: Perspective on Recent Decisions from Kansas and Minnesota," an article by Barkley and Barbara Clark in the February 2010 edition of *Clark's Secured Transactions Monthly*.  A copy of this article can be found in Attachment Four.

of the true owner has long been recognized.  It has never been the case that the true owners of

interests in real estate could be determined using the land records.

The use of MERS is in compliance with the statutory intent of the state recording acts.

When MERS is the mortgagee, the mortgage is recorded at the county land records, thereby

putting the public on notice that there is a lien on the property.  As the 1993 white paper

describing MERS makes clear, at certain time periods, the flow of assignments were

overwhelming the county recorder system, resulting in long backlogs, and in some cases, taking

the county recorder over a year to record an assignment.  Now that assignments are eliminated

because a common agent like MERS is holding the mortgage lien, the land records can operate

more efficiently.  Multiple assignments can lead to errors and uncertainty in the chain of title

because assignments were often missing, incomplete, inaccurate, or misfiled.  In situations

where the recorded assignment identified the wrong property, the lender had not perfected its

lien on the right property but had clouded the title for some unrelated third party.

The MERS® System also complements the county land records by providing additional

information that was never intended to be recorded at the county level, namely the

information about the mortgage loan servicer, and now, with the addition of MERS® InvestorID,

the name of the investor.

Some have raised questions about the reduction of recording fees that has accompanied

the elimination of the need to record assignments, and there have been suggestions that these

fees are somehow owed or outstanding.  Fees are paid for a service performed, and if a

document is eliminated because it is no longer legally necessary, no fee is due and owing

because there is nothing to record.  Another way to look at it is that, because MERS greatly

reduces the workload of county recorders, the lower operating expenses of the county

recorder's office offsets the loss in fee income.  Moreover, it would be the borrower, and not

the lender, who ultimately pays the costs of recording assignments, either directly or

indirectly.[13]

The use of MERS is based on sound legal principles.  Its legal validity has been upheld as

it was in the Cervantes, Jackson and In re Tucker cases, to just name a few.  While there is much

support by courts for the MERS role as a common agent, there have been cases where there

have been evidentiary issues, which have resulted in outcomes that do not always let MERS, or

its members, foreclose without going back and proving up the right to take action.  States have

laws that govern foreclosures[14] and when the process is not followed, it can, and should result

in a court not allowing it to go forward.  In some of these cases, judges wanting more evidence

or information about MERS have made comments about MERS.  In light of the recent

foreclosure crisis, it is probable that MERS will continue to be challenged.  But we are confident

that when courts are provided with all of the facts, MERS will continue to prevail.[15]  A MERS

case law outline (current through October 20, 2010) is available upon request.[16]

---

[13] On loans originated by correspondent lenders or brokers (where MERS is not the mortgagee), the costs of preparing assignments and the associated filing fees are paid directly on the HUD-1 and paid directly by the borrower.

[14] Individual states handle real estate foreclosures differently.  In some states the foreclosure process is judicial, and in some states it is non-judicial.  Under both systems, time frames and terms vary widely from state to state. A brief, general, description of both processes prepared by the Mortgage Bankers Association can be found in Attachment Five.

[15] Some important recent cases upholding the rights of MERS include:

o  **IN RE Mortgage Electronic Registration Systems (MERS) Litigation**, a multi-district litigation case in federal court in Arizona where the court issued a favorable opinion, stating that "The MERS System is not fraudulent, and MERS has not committed any fraud."

o  **In re Tucker** (9/20/2010), where a Missouri bankruptcy judge found that the language of the deed of trust clearly authorizes MERS to act on behalf of the lender in serving as the legal title holder.

o  **Mortgage Electronic Registration Systems, Inc. v. Bellistri**, 2010 WL 2720802 (E.D. Mo. 2010), where the court held that Bellistri's failure to provide notice to MERS violated MERS' constitutional due process rights.

o  **Taylor v. Deutsche Bank Nat'l Trust Co.**, So. 3d, 2010 WL 3056612 (Fla. 5th DCA 2010), where the court held the MERS mortgage to be valid under Florida law, and held that MERS may assign its rights in the mortgage to the foreclosing company who holds the note.  The Florida court also held that where MERS is described as the "mortgagee

## MERS CONTINUES TO IMPROVE ITS PROCESSES

In 2009, when it came to our attention that some employees designated by member institutions to serve as MERS certifying officers were not entrusted by their own institutions with signing authority, MERS enhanced its procedures to require that each MERS certifying officer be a company officer of the member institution. In addition, MERS has developed a primer containing information to be reviewed by each prospective MERS certifying officer. To test this knowledge, MERS instituted an online examination to make sure prospective certifying officers had a basic knowledge of MERS and of their roles and responsibilities as MERS certifying officers. MERS requires that these certifications be renewed annually, and we also instituted a recertification process for current certifying officers who had been designated prior to establishment of the online examination. MERS will continue to enforce these policies and refine its testing and certification program in recognition of the responsibility involved in initiating a foreclosure on someone's home.

When we saw actions were being undertaken to accelerate foreclosure document processing, we became concerned that certifying officers might be pressured to perform their responsibilities in a manner inconsistent with the MERS rules. When we did not receive the assurances we thought appropriate that this would not happen, we suspended relationships with some prominent players involved in the foreclosure process.

---

under the Security Instrument" the document grants to MERS legal status under the UCC, which MERS can assign to the foreclosing bank.

o   **Deutsche Bank Natl. Trust Co. v. Traxler**, 2010-Ohio-3940, where the Ohio Court of Appeals recognizes MERS' authority to assign a mortgage when designated as both a nominee and mortgagee.

o   **King v. American Mortgage Network, et al.**, United States District Court, District of Utah, Northern Division (Case No. 1:09-CV-125 TS), where the court, interpreting the language of the deed of trust, held that MERS had the authority to initiate foreclosure proceedings, appoint a trustee, and to foreclose and sell the property.

[16] A review of the use of MERS in all fifty states was done by Covington and Burling in 1996 and 1997 as part of the due diligence associated with the creation of MERS.  It is available upon request.

When we discovered that some "robo-signers" were MERS certifying officers, we contacted those certifying officers and suspended their authority. They will not be recertified until they retrain and submit to reexamination, and the members who employed them provide MERS with a plan on what will be changed within their companies to prevent this from happening again.

The MERS management team is committed to the highest standards; we believe that MERS adds great value to our nation's system of housing finance in a way that benefits financial institutions, borrowers and the government.  There are many benefits derived from the MERS database:

- The MERS database is available to borrowers to locate their servicers, and in many cases, to identify note-owners.

- For local communities, MERS has become a much-needed link between code enforcement officers and the servicing community to help combat the blight that vacant properties bring to neighborhoods.  Over 600 government institutions (cities, municipalities and states) utilize the MERS® System for free to look up the property preservation contacts for loans registered on the system.  This helps save the code enforcement officers much needed time in searching for the company directly responsible for the upkeep of that vacant property.

- For law enforcement agencies, MERS aids in combating mortgage fraud through the detection of undisclosed multiple liens taken out by fraudsters for the same social security number or property.

Also, with MERS, lien releases occur quickly at the time of payoff for borrowers because there can be no break in the chain of title with MERS.  And finally, foreclosures in the name of MERS are not allowed without the note.

## IDEAS FOR THE FUTURE

The MERS database, coupled with the Mortgage Identification Number, is a powerful tool that can be harnessed by the Congress and the industry to improve the mortgage finance system.  There are a number of ideas that are worth considering so that when we emerge from this current crisis we have a housing finance system that meets our needs.

1.  All residential home loans should be uniquely identified and tracked on a national database, which should include:

    a.  Who is the borrower?

    b.  What/Where is the property?

    c.  Who is the owner of the loan's promissory note (the originator/investor)?

    d.  Who is the servicer of the loan (the mortgage company)?

2.  The cost of registration for the loan should be included with the other origination fees and disclosed on the HUD -1 at closing.

3.  The national database should also track who has physical custody of the original promissory note (the mortgages are always available in the county land records).

4.  The database should reflect both current and historical information regarding the home loan.

5.  The national unique identifier should be a full life-of-loan identifier, from origination through final satisfaction (payoff) and lien release.

6.  All federal data systems that deal with home loans should be required to integrate the unique national identification number, so that information regarding loans can be linked across multiple data sources, e.g., the FHA should be able to look at HUD data, and FDIC should be able to look at SEC information, always knowing that they are comparing apples to apples.  State and local government agencies should also be encouraged to adopt the number.

Mr. Chairman, all of us at MERS keenly understand that while owning your own home is a dream, losing that home is a nightmare.  As professionals who have dedicated ourselves to helping people realize their dream, we are deeply dismayed by the current foreclosure crisis.  We take our role as a mortgagee very seriously and we see our database as a key to moving toward better access to information and transparency for consumers.

I am hopeful that as people understand more about MERS and the role we play, they will see that MERS adds great value to our nation's system of housing finance in ways that benefit not just financial institutions, the broader economy and the government, but—most of all—real people.

Thank you for holding these hearings and inviting MERS to participate.

**ATTACHMENTS:**

1)  Sample mortgage document
2)  MBA Fact Sheet on MERS
3)  "Title Transfer Law 101," by Karen Gelernt, *American Banker*, October 19, 2010
4)  "MERS Under Attack: Perspective on Recent Decisions from Kansas and Minnesota," by Barkley and Barbara Clark, *Clark's Secured Transactions Monthly*, February 2010
5)  "Judicial Versus Non-Judicial Foreclosure," Mortgage Bankers Association, October 2010